2004 OK CR 3

**Christopher William MESSICK, Jr., Appellant,**

v.

**The STATE of Oklahoma, Appellee.**

**No. F–2002–1369.**

Court of Criminal Appeals of Oklahoma.

Jan. 27, 2004.

<hr>

Katrina Conrad–Legler, Appellate Defense Counsel, Norman, for Appellant on Appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Kellye Bates, Assistant Attorney General, Oklahoma City, for Appellee on Appeal.

## OPINION

CHAPEL, J.

¶ 1 Christopher William Messick, Jr., was convicted of two counts of Attempted Murder in the First Degree (Counts I & II), under 21 O.S.2001, § 701.7 and 21 O.S.2001, § 42, in Creek County District Court, Case No. CF–2002–4.[1] The jury recommended a sentence of life without parole on each of the two counts. The Honorable Franklin D. Rahhal did not follow the jury's sentencing recommendation, however, and instead sentenced Messick to imprisonment for twenty (20) years on each of the two counts, with the sentences to run consecutively.[2] Messick appeals his convictions and his sentences.

¶ 2 On December 22, 2001, Christopher Messick and his wife, Rachel Messick, along with their two-year-old son, Colby, stopped to visit in the home of their neighbor, Darrell Medlock, in Drumright.[3] While they were there, both Messick and Rachel took about three hits off of a marijuana joint. Rachel testified at trial that although she and Messick were both using "a lot" of methamphetamine and marijuana at the time, on virtually a daily basis, neither one of them used any methamphetamine that day.[4] They went home because Messick was tired.

¶ 3 When they got home around 3:30 p.m., however, Messick was unable to fall asleep. At some point he came out of the bedroom while Rachel was making brownies,

R. Lawrence Roberson, O.I.D.S Non–Capital Trial Division, Sapulpa, for Defendant at Trial.

Pamela Hammers, Assistant District Attorney, Creek County District Attorney, Sapulpa, for the State at Trial.

1. Count I involved the attempted murder of Messick's wife; Count II involved the attempted murder of their two-year-old child. In addition to these counts, the original information charged Messick with Arson in the First Degree, under 21 O.S.2001, § 1401 (Count III); and Injury of a Minor Child, under 10 O.S.2001, § 7115(A) (Count IV). Counts III and IV were dismissed at a motion hearing on the day trial began.

2. The circumstances and rationale for the trial court's decision to diverge from the jury's recom-

mended sentence are addressed within the discussion of Messick's Proposition I.

3. Rachel had two older children from a previous marriage, who were also with the family, but they were picked up by their father at the Medlock home for the Christmas holiday.

4. Rachel testified, "It was nothing for us to sit down and go through a sixteenth of meth between the two of us in a twenty-four-hour period."

and she noticed a bottle of pills in his pocket. When Messick refused to let her see what they were, Rachel threatened to divorce him, saying that she "wasn't going to be in a marriage where there were going to be a lot of secrets."[5] Shortly thereafter, Messick came up behind Rachel, as she was wrapping a Christmas gift, and began putting her in a chokehold, cutting off her breathing. Rachel pleaded with him to stop, but he responded, "Just don't fight it." Rachel soon passed out onto the dining room floor.

¶ 4 When Rachel woke up, she was confused about her whereabouts, but then realized that Messick was hitting her on the back of the head with something. She then lost consciousness again. At some point Rachel woke up enough to see Messick carrying Colby into the dining room, holding him by his head/neck. She passed out again, then awoke to find Messick stuffing a rag into her mouth, apparently to keep her from screaming, while still holding Colby. Rachel passed out again, and awoke to see Messick squatting down doing something, i.e., setting the house on fire. When Rachel looked at him, he looked her in the eye and said, "It is okay, baby. I will see you in heaven." Rachel passed out a final time, and awoke to the smell of smoke and a feeling of intense heat.

¶ 5 Despite her thoroughly battered and extremely weak condition, Rachel managed to find Colby and get him into a bedroom. The doors to the house were locked and blocked by fires. After almost giving up from exhaustion and pain, Rachel managed to break a window, open it up, and set Colby down on the ground outside. She did not, however, have the strength to get herself out of the house. Fortunately, a neighbor heard the glass breaking and found Rachel hanging out the window. That neighbor and another then got her out and called the Drumright Fire Department.

¶ 6 Rachel and Colby were taken to St. Francis Hospital in Tulsa. Colby was treated for smoke inhalation and some burns and released later that day. Photographs admitted at trial show that Colby had bruising on his face and on his left ear. Photographs of Rachel admitted at trial show that she had bad bruising and swelling on her face, especially around her mouth and lips, around her eyes, on her right cheek, and also on her right ear. Rachel also had bruising on her neck, chest, and back, as well as first and second degree burns on her hands. The orbital bone around her left eye was fractured; and she had conjunctive hemorrhages in both eyes. Rachel was treated for excessive smoke inhalation and kept in the hospital for three days.

¶ 7 Four separate fires had been set in the home. Only one of the fires was still burning when the fire department arrived, though it was almost to the point of getting out of control and had to be extinguished. This fire, along with another one, was set in the dining room, where Rachel (and possibly Colby) lay unconscious on the floor. This main fire was set in front of the door between the dining room and a child's bedroom, apparently by igniting a pile of clothing. Photographs admitted at trial show substantial damage, especially to the area above and around the door. Two other fires were set in the living room near the front door, apparently by igniting a diaper and a child's blanket. These fires, as well as the second dining room fire, self-extinguished.

¶ 8 Messick called the Okfuskee County Sheriff's Office two days later, on Christmas Eve, and turned himself in peacefully.[6] In a tape-recorded statement to Okfuskee County Undersheriff Roy Wilbourn, which was admitted at trial, Messick confessed to hurting his wife "real bad" by "choking her and

---

5. Rachel testified that she had never mentioned divorce before, but that Messick had been acting very strangely in the two previous months. She testified that he was "scaring" her and acting "schizo" and "very paranoid." She testified that Messick had stopped wanting to go to work and was afraid people were out to get him and that she was going to leave him for someone else. Rachel testified that she believed the changes in his behavior were due to his drug use.

6. Messick had been hiding in a residential home that he had broken into and found unoccupied. Messick reported that after fleeing his home on foot, he stole a truck, drove it until it ran out of gas, hitchhiked for a while, stole another truck, drove it until he crashed it, then walked through a woods until he came upon the home at which he was arrested.

stomping on the back of her neck." He admitted to choking his wife until she passed out and that he thought he had killed her. When asked if he stomped on the back of her neck to make sure she was dead, Messick responded, "Yes, sir." He also confessed to hurting his child "by twisting his head." When asked if he was trying to break the child's neck, Messick responded that he "was tryin' to." He later admitted that he was trying to kill his child. Messick also admitted that he set fires in the house, leaving his wife unconscious on the floor.[7]

¶ 9 When asked why he had hurt his wife and child, Messick talked about not wanting his wife to leave him and not wanting someone else raising his child. He noted that he was headed to jail on other charges—assault and battery on a police officer, eluding an officer, and two other charges—arising from an incident earlier that month. When asked about drug use, Messick readily admitted to being a user of "crank" (methamphetamine) and marijuana, but stated that he had only had three or four hits of marijuana that day. He also stated that he had been in "lockdown" in Creek County Jail for the previous

week, where he had been unable to get any crank, though he did get some marijuana.[8]

■ ¶ 10 In Proposition I, Messick asserts that his convictions for Attempted Murder in the First Degree violate due process, because the crime of attempted first-degree murder does not exist in Oklahoma. He maintains that it was improper for the State to charge and convict him under Oklahoma's general attempt statute, 21 O.S.2001, § 42, in combination with the first-degree murder statute, 21 O.S.2001, § 701.7, because a separate statute specifically addresses the kind of attempted killing with which he was charged, namely, 21 O.S.2001, § 653(C).

¶ 11 Messick raised this claim at the trial court level, where it was rejected by the district court before trial.[9] Messick was then tried and convicted of Attempted Murder in the First Degree, as defined under § 42 and § 701.7. At the time of sentencing, however, the district court reluctantly concluded that Messick's legal argument was valid and, consequently, that the maximum sentence that could be imposed for the attempted killings of his wife and child was twenty years im-

---

7. Messick stated that his child was only a few feet away when he was assaulting his wife, but that he did not know where his child was when he left.

8. Although the State did not emphasize this piece of evidence, it likely hurt Messick's "the-meth-made-me-do-it" defense at trial, which otherwise had substantial support within Rachel's testimony and that of other witnesses. In fact, Rachel testified for the defense later in the trial that before Messick's drug use, he "was very kind, compassionate, caring, done what he had to to keep his family fed and happy" and that he had treated she and Colby "like a pot of gold."

9. On the morning Messick's trial was scheduled to begin, his counsel filed a motion to dismiss the attempted first-degree murder counts (Counts I and II), raising the same arguments and authority discussed herein. Defense counsel likewise filed a separate motion to dismiss the arson count (Count III), arguing that the original Information violated double jeopardy by charging both arson and attempted murder in the way that it did. (Count I charged that Messick attempted to kill Rachel "by means of strangling [her] causing her to pass out, then setting fire to the residence." Count II charged that Messick attempted to kill Colby "by means of setting fire to

the residence while [Colby] was inside the residence, trapping [him] inside.")

The district court began by noting its dissatisfaction with the timing of the motions to dismiss, and then announced it would take up the motion regarding the arson count first. The State argued that the actual evidence would show that the attempted killings were separate and prior to the setting of the fires. The trial court responded that the Information was not set out that way. The State then agreed to dismiss Counts III and IV and allege only two counts of attempted murder (even though defense counsel had not requested dismissal of Count IV).

The district court then took up the motion regarding the attempted first-degree murder counts. The court recognized the validity of the motion, but then found that based on this Court's unpublished decision in *Deckard v. State*, Case No. F–1999–1545 (Okl.Cr. Nov. 9, 2000), a case arising out of that same courtroom, the court was denying the motion to dismiss. In *Deckard* this Court affirmed a conviction for "Attempted First Degree Murder" and a sentence of "life imprisonment with the possibility of parole" for this crime. The trial court commented that "if there was something wrong, I'm sure—if that wasn't accurate, they would have said something about it." The State then filed an Amended Information charging two counts of attempted

prisonment on each of the two counts, based on § 652(C). The district court then sentenced Messick to twenty years on each of the two counts, to be run consecutively, rather than the life without parole sentences given by the jury [10]. The court did not, however, modify the description of the crimes upon which Messick was convicted. Hence the Judgment and Sentence states that Messick was convicted of two counts of "Attempted Murder in the First Degree," under "21 O.S. 701.7."

¶ 12 Oklahoma's general attempt statute states (in relevant part) as follows:

Every person who attempts to commit any crime, and in such attempt does any act toward the commission of such crime, but fails, or is prevented or intercepted in the perpetration thereof, is punishable, *where no provision is made by law for the punishment of such attempt,* as follows:

1. If the offense so attempted be punishable by imprisonment in the penitentiary for four (4) years or more, or by imprisonment in a county jail, the person guilty of such attempt is punishable by imprisonment in the penitentiary, or in a county jail, as the case may be, for a term not exceeding one-half (1/2) the

longest term of imprisonment prescribed upon a conviction for the offense so attempted.[11]

Thus, by its own terms, the general attempt statute only applies where our criminal code does not contain a separate provision applying to the specific kind of attempt charged.[12]

¶ 13 Messick maintains that § 652(C), which appears within Chapter 21 of Title 21, entitled "Attempts to Kill," is just such a provision. It states:

Any person who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death, *or in any manner attempts to kill another,* or in resisting the execution of any legal process, shall upon conviction be guilty of a felony punishable by imprisonment in the State Penitentiary not exceeding twenty (20) years.[13]

Hence § 652(C) applies to all attempts to kill. It also establishes the maximum penalty for such attempts (other than those that are separately proscribed) as twenty (20) years imprisonment.

¶ 14 This Court has recognized the inappropriateness of charging attempts to kill under the general attempt statute for over fifty years.[14] In *Ex Parte Smith,*[15] the Court

---

first-degree murder (and not even mentioning the setting of fires in the home).

10. The Judgment and Sentence contains a notation explaining the court's divergence from the jury's recommendations and noting that the sentences given are the maximum under § 652(C).

11. 21 O.S.2001, § 42 (emphasis added).

12. *See also* 21 O.S.2001, § 11 (specific provisions making particular act criminal and providing the punishment therefore control over general criminal statutes that would otherwise be applicable).

13. 21 O.S.2001, § 652(C) (emphasis added). Section 652(A) applies specifically to shooting with intent to kill, with a maximum sentence of life; § 652(B) applies specifically to using a vehicle to facilitate a shooting, with a maximum sentence of twenty (20) years. *See* 21 O.S.2001, § 652.

14. In fact, the Court addressed this issue as early as 1942, in its decision in *Minter v. State,* 75 Okla.Crim. 133, 129 P.2d 210 (1942). In *Minter,* the Court reversed a conviction of "attempted murder," under the § 42 general attempt statute, finding that the defendant should have been

charged with willful poisoning of someone's food. *Id.* at 212–13. The *Minter* Court noted that "[t]he general attempt statute, by its own terms, applies only where there is no other provision of law for the punishment of such attempt." *Id.* at 213. The Court further commented that it was "unable to find any case in Oklahoma where the crime charged against the defendant is that of 'attempted murder' under [§ 42]" and surmised that this was probably true "because we have other specific statutes dealing with 'Attempts to Kill.' " *Id.* at 212 (citing Title 21, Chapter 21).

Nevertheless, the *Minter* Court concluded that it was not necessary for it to decide the question of whether "attempted murder" could ever be charged under § 42, because the crime that the defendant had committed was specifically prohibited under 21 O.S.1941, § 832. *Id.* at 213. The Court found that it would have been improper to charge Minter under any of the attempted killing provisions of Chapter 21, because no person had actually "taken" the poisoned food (because the defendant was observed tampering with his wife's lunch). *Id.* at 212.

15. 95 Okla.Crim. 370, 246 P.2d 389, 392–93 (1952).

granted habeas corpus relief to a prisoner who had pled guilty to "Attempted Murder" and been sentenced to imprisonment for fifty (50) years.[16] The Court noted that 21 O.S., § 42 "is a general statute designed to cover attempts to commit crimes where there has been no specific enactment of the Legislature to cover such attempted crimes."[17] The Court also found that "attempts to kill by shooting are specifically provided for by statute," namely, 21 O.S., § 652.[18]

¶ 15 The *Smith* Court noted that the language of the general attempt statute specifically limited that provision to situations "where no provision is made by law for the punishment of such attempt," and hence that "no question of election is involved."[19] The Court found this conclusion "inescapable" and noted that "[t]o hold otherwise would negate the plain unmistakable language of the statutes."[20] We agree. We continue to hold, as the *Smith* Court did over fifty years ago, that the crime of attempted murder cannot be charged under Oklahoma's general attempt statute, 21 O.S., § 42, but rather must be charged under the specific provisions of Title 21, Chapter 21 (§§ 651–653).

¶ 16 The State acknowledges this Court's governing decisions in *Smith* and also *Minter*. The State argues, however, that "in recent years, this Court has recognized the crime of Attempted Murder in the First Degree," citing three cases (including two unpublished cases) in which this crime was mentioned. Thus it appears that clarification of this issue is warranted.

¶ 17 The only published case cited that mentions this crime is *Stemple v. State*.[21] Yet the conviction for attempted murder in that case was reversed on sufficiency grounds, making the more thorny legal question of whether the crime actually existed unnecessary to the resolution of that case.[22] In addition, the issue of the crime's existence was not raised in that case.

¶ 18 Similarly, the issue was not raised in the two unpublished cases referenced by the State: *Deckard v. State*, Case No. F–1999–1545 (Okl.Cr. Nov. 9, 2000), and *James v. State*, Case No. F–1995–420 (Okl.Cr. May 14, 1996). As noted by the trial court in the current case, this Court upheld a conviction for Attempted First Degree Murder, with a sentence of life imprisonment, in *Deckard*. In addition, this Court upheld a conviction for Attempted Murder in the First Degree, with a sentence of twenty (20) years, in *James*. Yet the propriety of charging a defendant with attempted murder by use of the general attempt statute (§ 42) and the first-degree murder statute (§ 701.7) simply was not raised or addressed, implicitly or explicitly, in either of those cases.

¶ 19 In fact, a review of the briefs in the *Deckard* case reveals that Deckard never questioned the validity of the attempted murder charge in his case, and that he actually conceded that his sentence of life imprisonment was within the proper sentencing range for this crime (though he maintained that it was nonetheless excessive).[23] The trial

16. The language of the information, which the Court obtained, made clear that the defendant was accused of shooting the victim "with a premeditated design" to take his life. *Id.* at 391.

17. *Id.* at 392. The language of 21 O.S.1941, § 42 that was being considered in 1952 is substantively identical to the current § 42, quoted *supra.*

18. *Id.* at 392. At the time, this section provided as follows: "Every person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of firearm, airgun or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death or in resisting the execution of any legal process is punishable by imprisonment

in the penitentiary not exceeding ten years." 21 O.S.1941, § 652. Hence the scope of Section 652 was somewhat less in 1952, and the range of punishment was substantially less. The *Smith* Court noted that 21 O.S.1941, § 653 covered all other assault-with-intent-to-kill offenses, not covered by § 652. *Id.* at 392. It still does. *See* 21 O.S.2001, § 653.

19. *Id.* at 392 (citing *Minter*).

20. *Id.*

21. 2000 OK CR 4, 994 P.2d 61, *cert. denied*, 531 U.S. 905, 121 S.Ct. 247, 148 L.Ed.2d 178 (2000).

22. *Id.* at 71–72.

23. The Appellant's brief in *Deckard* states as follows: "Although Mr. Deckard's sentences are

court's expressed belief that if there was something "wrong" with the attempted murder charge in that case, surely this Court "would have said something about it" reveals a misunderstanding of this Court's role in the judicial process.[24]

¶ 20 It is the role of the Court of Criminal appeals to decide the issues that are properly raised before it. Where an error, obvious or otherwise, is not properly raised in a case before this Court, the Court's failure to address or "fix" the error cannot and must not be interpreted as a finding by the Court that the error does not exist, that the judgment and sentence are entirely "correct" and appropriate, or that all of the findings and rulings at the trial court level were proper. We nevertheless recognize that the fact that this Court has upheld convictions for "attempted first-degree murder," though in unpublished opinions, may have caused confusion for some. This opinion is intended to rectify any such confusion. We also note that the current decision avoids the philosophical and pragmatic problems of attempting to determine what constitutes "one-half" of a sentence of life or life without the possibility of parole.[25]

¶ 21 Hence we find that Messick's convictions for Attempted Murder in the First Degree, under 21 O.S.2001, § 701.7 and 21 O.S.2001, § 42, cannot stand. Messick should have been charged and tried under 21 O.S.2001, § 652(C), for Assault and Battery with Force Likely to Produce Death or, simply, Attempt to Kill. And thus we come to the question of relief.

■ ¶ 22 The State maintains that because Messick has already been sentenced according to the maximum sentence under § 652(C), he has suffered no prejudice and the Judgment and Sentence is "not defective." Messick maintains that because he was charged and tried for a crime that "does not exist," he should be given a new trial. We reject both of these approaches. Messick has demonstrated, and this Court herein concludes, that the crime of Attempted Murder cannot be charged under Oklahoma's general attempt statute. Attempted killings, such as those committed by Messick, must be charged and punished under the specific Attempt to Kill provisions of Title 21, Chapter 21, §§ 651–653.

■ ¶ 23 Nevertheless, Messick has not been prejudiced by his convictions for attempted murder such that he is entitled to a new trial.[26] The evidence presented by the State more than adequately established that Messick committed an assault and battery upon both his wife and his child, with such force as was likely to produce their deaths, and also that by so doing he was attempting to kill both of them.[27] In fact, Messick admitted all the essential elements for these § 652(C) crimes within his taped confession to Undersheriff Wilbourn. The fact that the State also presented evidence sufficient to establish that Messick was acting with "malice aforethought," as is required by the first-degree murder statute, does not undermine the adequacy of the State's evidence to support the lesser offenses under § 652(C).

¶ 24 Messick had adequate notice of the nature of the State's case against him, and he does not claim that his defense was affected by the trial court's initial rejection of his legal arguments regarding the attempted

---

technically within the range provided by law, they do not bear a direct relationship to the nature and circumstances of the offenses."

**24.** This Court does commend the trial court, however, for making the difficult but correct decision to modify the sentences pronounced by Messick's jury, such that they are in accord with § 652(C).

**25.** The *Minter* Court likewise noted, "[I]t appears doubtful if the Legislature ever contemplated that such an offense as 'attempt to murder' should ever be filed under [21 O.S., § 42], because of the indefiniteness of the punishment

which may be assessed." 129 P.2d at 213. The Court noted that charging under one of the specific attempt-to-kill statutes avoided the problem of determining how to instruct upon and apply a sentence of "one-half of life imprisonment." *Id.*

**26.** *See* 22 O.S.2001, § 952 (limiting grants of new trials to situations where defendant's "substantial rights have been prejudiced").

**27.** Messick's Proposition II claim that the evidence presented against him at trial was insufficient to convict him of first-degree attempted murder has been rendered moot by this Court's resolution of his Proposition I claim.

murder counts.[28] He has not provided even a hypothetical example of how he was prejudiced by the State charging and trying him for a greater crime than the one upon which he will now be held accountable.[29] The jury sentenced Messick to the harshest penalty upon which it was instructed; hence there can be no doubt that the jury fully appreciated the heinous nature of Messick's crimes and that it intended that he be punished as severely as legally possible. The trial court has already sentenced Messick to the maximum possible sentence of twenty (20) years for each of the two counts upon which he was convicted, to be run consecutively. We find that these sentences are the maximum allowable under the law. They are far from excessive.[30]

¶ 25 Under these circumstances, it is appropriate to modify the Judgment and Sentence in Messick's case from two counts of Attempted Murder in the First Degree to two counts of Attempt to Kill, under 21 O.S. 2001, § 652(C).[31] And as so modified, we affirm these convictions. Because the trial court has already appropriately sentenced Messick to the maximum sentence upon each of these counts, we affirm his sentences.

## Decision

¶ 26 Messick's **CONVICTION** for Counts I and II, Attempted Murder in the First Degree, is **MODIFIED** to Counts I and II, **ATTEMPT TO KILL**. As so modified, Messick's conviction for two counts of Attempt to Kill is **AFFIRMED**. Messick's **SENTENCE** of twenty (20) years imprisonment for each of these two counts, to be run consecutively, is **AFFIRMED**.

JOHNSON, P.J., LILE, V.P.J., LUMPKIN and STRUBHAR, JJ., concur.

---

**28.** In fact, there can be little doubt that Messick likely benefited by the chain of events in this case, since it is hard to believe that the State would have agreed so easily to dismiss Counts III and IV (arson and injury to a child), rather than modifying the language of the Information, if it had not been relying on the trial court's (mistaken) ruling that the first-degree attempted murder counts were valid and that they subjected Messick to sentences of either life or life without parole.

**29.** Messick writes in his brief, "There is no question that Appellant has been prejudiced by his trial proceedings." Yet he offers not even a single example of how he was prejudiced.

**30.** We hereby reject Messick's Proposition III excessive sentence claim. We also reject his Proposition IV cumulative error claim, finding that the only error established has already been addressed and resolved.

**31.** *See* 22 O.S.2001, § 1066 (Court's power to modify judgment and sentence); *see also McArthur v. State,* 1993 OK CR 48, 862 P.2d 482, 484–85 (modifying conviction from robbery with dangerous weapon to robbery by force or fear); *Kolberg v. State,* 1996 OK CR 41, 925 P.2d 66, 69 (modifying conviction from felony escape to misdemeanor).